FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

2001 SEP 26  A 9: 13

MCI TELECOMMUNICATIONS                :
CORPORATION                           :

    v.                                :    CIVIL NO. L-90-3117
                                              :

THEODORE ALLEN                        :
COMMUNICATIONS, INC., et al.          :


## MEMORANDUM

In November 1990, plaintiff, MCI Telecommunications ("MCI"), filed a complaint

against defendants, Theodore Allen Communications, Inc. and its principals, Theodore Graham

and Allen Samuel ("TAC"[1]).  MCI provided TAC with telecommunications service in 1989 and

1990.  MCI's complaint alleges that TAC breached its contract by failing to pay for $81,599.61

in telecommunications services.  TAC filed a six-count counterclaim, essentially alleging that

MCI engaged in various practices designed to drive TAC out of business so that MCI could co-

opt its customers.

After winding its way through judicial and administrative fora for nearly eleven years, the

following three claims remain: (i) MCI's claim for $81,599.61 in unpaid bills for provision of

telecommunications services, plus interest, costs, and attorney's fees; (ii) TAC's counterclaim

alleging fraudulent inducement; and (iii) TAC's counterclaim for damages stemming from

MCI's violation of section 201(b) of the Federal Communications Act ("the Act").  In prior

administrative proceedings, the FCC concluded that MCI had violated section 201(b), but left it

to this Court to determine the measure of damages.

---

[1]     Unless otherwise stated, "TAC" refers to the defendants collectively.



On February 23, 2001, the plaintiff filed a motion for summary judgment.  In its motion, MCI seeks a judicial determination that (i) TAC owes it $81,599.61 in unpaid bills, (ii) the damages for its violation of section 201(b) of the Act are limited to the discounts not awarded, $8,452.89, and (iii) TAC's claim of fraudulent inducement is without sufficient factual basis to withstand summary judgment.  On March 27, 2001, the defendant filed a cross-motion for summary judgment and opposition to the plaintiff's motion for summary judgment.  In its motion, TAC argues that (i) it is insulated from liability for the $81,599.61 in unpaid bills because MCI engaged in willful misconduct, (ii) it is entitled to a jury determination on the issue of damages for the violation of section 201(b) because TAC is entitled to consequential damages and attorney's fees in addition to the $8,452.89, and (iii) there are factual issues in dispute regarding the claim of fraudulent inducement, which preclude summary judgment.  Because the motions have been fully briefed, the Court will dispense with a hearing.  See Local Rule 105.6 (D. Md. 1999).

Having carefully considered the papers, the Court concludes (i) MCI is entitled to summary judgment in its favor for the $81,599.61 in unpaid bills, (ii) the damages owed to TAC for MCI's violation of the Act are limited to the discounts not awarded, $8,452.89, and (iii) TAC has offered insufficient evidence from which a reasonably minded jury could find fraudulent inducement.  Accordingly, the Court shall, by separate Order, GRANT Plaintiff's Motion for Summary Judgment and DENY Defendants' Cross-Motion for Summary Judgment.       This order does not dispose of the case because parties' briefs left unresolved legal and factual issues regarding interest, costs, and attorney's fees.

2

I.    **Factual Background**:[2]

This dispute arises out of MCI's claim for $81,599.61 in unpaid bills for

telecommunications services rendered to TAC between June 1989 and May 1990.  TAC

concedes that it received these services, but argues that MCI tried to drive it out of business by

not following through on offers of discounts and complicating TAC's business operations with

billing errors.

Defendants Theodore Graham and Allen Samuel formed TAC in 1988 to provide long

distance service to business and residential customers.  TAC operated as a "switchless rebiller."[3]

It did not own any telecommunications equipment, but rather purchased large amounts of service

from long-distance carriers like MCI for resale to individual customers.  TAC solicited clients for

its service and billed them individually based on records provided by MCI.  By purchasing long

distance service through TAC, rather than directly from MCI, individual customers could receive

volume discounts for which they would not normally qualify.  Understandably, MCI disliked

dealing with "switchless resellers," who could lure profitable, full-freight customers away from

MCI.

TAC and MCI entered into a service agreement on June 14, 1989.  TAC enrolled for

MCI's Prism Plus service, which carried a 4% discount from MCI's standard rates.  TAC alleges

that it was told that it would be eligible for a 20% discount once "the total traffic of all of TAC's

---

[2]    Because this case was previously before this Court, much of the factual
background is a reiteration of the factual background from the Court's previous
Memorandum on the plaintiff's Partial Motion to Dismiss.  See MCI
Telecommunications, Inc. v. T.A. Communications, Inc., 40 F. Supp. 2d 728 (D. Md.
1999).

[3]    This type of operation is also described as a "reseller" or "aggregator."

3

customers reached the level of $2,500 per month." See TAC's FCC Complaint ¶ 18. The higher level of discount was known as the Corporate Account Service discount ("CAS"). TAC soon achieved total aggregated monthly billings of more than $2,500, but was denied the CAS discount by MCI. MCI claimed that the CAS tariff did not allow aggregation of separate accounts not owned by the MCI account holder. TAC claims that it had clearly explained the nature of its business to MCI representatives before signing the June 14 contract.

In December 1989, Mr. Reckart, an MCI employee, suggested the VNET program to TAC. Mr. Reckart was unsure what specifications the program required, but thought it might entitle TAC to discounts. See TAC's Memorandum at 5. However, a short time later, MCI deemed TAC ineligible for the VNET program, stating that each TAC account must exceed the minimum threshold for the discount, as opposed to TAC's overall monthly billings from MCI.

Finally, in the spring of 1990, TAC and MCI representatives, Spencer and Reckart explored programs through which TAC might receive greater discounts. Spencer and Reckart gave TAC two draft proposals for a "Special Customer Arrangement" ("SCA"). However, no contract was ever signed, and several weeks later, MCI informed TAC that it would not receive an SCA because the tariff did not permit TAC to receive such discounts. TAC contends that it was denied an SCA because it targeted Ferris Baker Watts, an existing MCI customer.

In May 1990, TAC went out of business without paying its outstanding account balance to MCI. MCI filed the present suit in November 1990 to recover $81,599.61 in unpaid bills for service rendered to TAC. The suit named TAC and its two principals, Graham and Allen, who had executed personal guaranties. On February 19, 1991, TAC filed a six-count counterclaim.

4

In 1993, this Court administratively closed this case, so that the parties could refer the Communications Act violations contained in count VI of the counterclaim to the FCC. The FCC found that the tariff language was ambiguous and that MCI had violated section 201(b) of the Act by not interpreting the language against itself. Therefore, MCI had failed to give TAC all of the discounts to which it was entitled. Theodore Allen Communications v. MCI Telecommunications Corp., 12 F.C.C.R. 6623 (1997) (the "FCC Order").

On March 9, 1998, this Court lifted its stay and reopened the case to determine a remedy for the section 201(b) violation and any outstanding claims. On March 22, 1999, the Court ruled on the plaintiff's Partial Motion to Dismiss, finding that the Communications Act violations were conclusively dealt with by the FCC and all but one of the state law claims (the fraudulent inducement claim) were preempted by the federal regulatory scheme. On February 23, 2001, MCI filed a motion for summary judgment, and on March 8, 2001, TAC filed a cross-motion for summary judgment.

II    **Summary Judgment Standard**:

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial.). Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in

5

the light most favorable to the non-moving party.  Pulliam Inv. Co. v. Cameo Properties, 810

F.2d 1282, 1286 (4th Cir. 1987).

III.    **Discussion**:

        **A. TAC's counterclaim of fraudulent inducement**:

        To establish a prima facie case of fraudulent inducement, the plaintiff must establish the

following:

> (1) that the defendant made a false representation; (2) that its falsity was either known to
> the defendant, or the misrepresentation was made with such reckless indifference to the
> truth as to be equivalent to actual knowledge; (3) that it was made for the purpose of
> defrauding the person claiming to be injured thereby; (4) that such person not only relied
> on the misrepresentation, but had a right to rely upon it in the full belief of its truth, and
> would not have done the thing from which the injury had resulted had not such
> misrepresentation been made; and (5) that such person actually suffered damage directly
> resulting from such fraudulent misrepresentation.

Parker v. Columbia Bank, 604 A.2d 521, 527 (Md. Ct. Spec. App. 1992).  The elements must be

established by clear and convincing evidence.  Dowty v. Communications Inc. v. Novatel

Computer Sys. Corp., 817 F. Supp. 581, 591 (D. Md. 1992).  Furthermore, the plaintiff must "do

more than state conclusory allegations, [it] must raise the possibility that [it] might prevail before

a reasonable jury considering the case in light of a fraud claim's heightened evidentiary burden."

Ludwig v. Premier Bank North, Inc., 935 F. Supp. 801, 807 (W.D. Va. 1996).

        TAC alleges that MCI engaged in fraud by promising that it would provide TAC with

discounts and other services, thereby inducing TAC to solicit customers and enter into contracts

6

with MCI.[4]  TAC argues that this fraud was part of MCI's larger anti-aggregator policy, which

encouraged TAC to build its customer base so that MCI could later drive TAC out of business

and co-opt TAC's customers.  TAC maintains that the following five facts support its claim of

fraud against MCI: (1) MCI continuously promised TAC enrollment in programs that provided

for higher discounts, only to deny TAC admission to those programs later; (2) MCI delayed

providing TAC with timely information required for TAC to bill its customers; (3) MCI provided

erroneous billing information to TAC, further damaging TAC's customer relations; (4) MCI

double-billed TAC's customers; and (5) MCI denied TAC the SCA discount because TAC had

targeted an existing MCI customer.  The Court will address each of TAC's five allegations in

turn.

### 1.    MCI's alleged promises and failure to provide discounts to TAC:

TAC alleges that MCI committed fraud by promising to enroll it in higher discount

programs and denying TAC those discounts later.[5]  In order to prove fraud based on these alleged

promises, TAC must prove that MCI representatives promised TAC that it would receive

discounts, while at the same time, having no intention of giving TAC the discounts.  See Parker,

604 A.2d at 360-61(stating that while "fraud cannot be predicated on statements that are merely

---

[4]      TAC claims that it entered into five contracts as a result of MCI's
misrepresentations: the CAS Letter of Understanding, the Prism Plus contract, the
Addendum to the Letter of Understanding, the VNET agreement, and the SCA
agreement.

[5]      Specifically, TAC alleges that MCI offered it participation in the CAS, CAS Plus,
VNET, and SCA programs.

promissory in nature, fraud may be predicated on promises made with a present intention not to perform them").

TAC devotes much of its brief to testimony and facts illustrating that MCI disliked dealing with aggregators, but fails to offer *any* evidence that MCI employees made promises of discounts, while never intending to give them. In fact, there is no evidence of anything other than confusion and disagreement over a complicated tariff structure. Without evidence of a promise made with a present intention not to perform it, TAC's assertions are conclusory and insufficient to support a claim of fraud against MCI.

        2.     **Billing errors**:

TAC also alleges that MCI committed fraud by (1) delaying timely information required for billing, (2) providing erroneous billing information to TAC, and (3) double-billing TAC's customers.[6] More specifically, TAC argues that MCI engaged in these billing practices as part of its campaign to drive TAC out of business. Despite TAC's half-hearted attempt to prove that MCI's billing errors were in furtherance of fraud, it provides no evidence from which a reasonable minded juror could conclude that MCI intentionally created billing errors to defraud TAC. In other words, based on the evidence, TAC proves nothing more than the typical billing confusion that afflicts even the garden-variety residential telephone subscriber.

---

[6]     The FCC took a cursory look at the allegation of double-billing, but found insufficient support for it. FCC Order at ¶ 15.

3.    **Denial of the SCA discount**:

Lastly, TAC argues that MCI's failure to grant TAC an SCA was fraudulent.  TAC

alleges that MCI denied it an SCA because it was trying to drive TAC out of business and

because TAC had targeted an existing MCI customer.  However, both parties state that the

proposals for an SCA were "drafts" and TAC never signed a contract with MCI for an SCA.

TAC fails to provide any evidence from which a reasonably minded juror could conclude that

Spencer and Reckart knowingly lied to TAC about the possibility of participation in SCA.

Accordingly, TAC's claim of fraud cannot survive.

B.    **MCI's claim for unpaid bills**:

MCI and TAC each move for summary judgment on MCI's original claim for payment of

TAC's outstanding bill.[7]  MCI argues that the material facts of the claim are not in dispute-

namely that MCI provided services and TAC admits that it has not paid for those services.  TAC

argues that summary judgment should be entered on its behalf because MCI's willful misconduct

insulates it from liability for the charges incurred.  Willful misconduct has been defined as

> the intentional performance of an act with knowledge that the performance of that act will
> probably result in injury or damage, or it may be the intentional performance of an act in
> such a manner as to imply reckless disregard of the probable consequences . . ., [or] the
> intentional omission of some act with knowledge that such omission will probably result
> in damage or injury, or the intentional omission of some act in a manner from which
> could be implied reckless disregard of the probable consequences of the omission.

---

[7]    Taking into account the setoff in the amount of discounts not awarded
($8,452.89), MCI claims that the total amount due is $73,146.72, plus interest, costs, and
attorney's fees.

Berner v. British Commonwealth Pac. Airlines, Ltd., 346 F.2d 532, 536-37 (2d Cir. 1965). TAC

contends that MCI engaged in willful misconduct by: (1) willfully construing its tariff in its own

favor; (2) denying TAC participation in the SCA discount program when MCI learned that TAC

intended to target an existing MCI customer; and (3) engaging in an anti-aggregator policy.

TAC's claim for willful misconduct must fail because TAC does not offer evidence of an intent

on MCI's part to harm TAC.

First, while the FCC found that the tariff was ambiguous and that MCI violated section

201(b) of the Act by failing to interpret it in TAC's favor, there is no evidence that MCI's

interpretation of the tariff was unreasonable, arbitrary, or taken with the intent of harming TAC.

Second, TAC's contention that MCI denied TAC participation in the SCA program

because TAC targeted an existing MCI customer is without factual support. TAC points to Mr.

Reckart's affidavit as support for this contention, and although Mr. Reckart's affidavit indicates

that MCI was unhappy with TAC's signing of an existing MCI customer, it fails to establish a

causal connection between that unhappiness and the denial of the SCA discount.[8]   Without

proof of a causal connection, TAC fails to establish that MCI engaged in willful misconduct.

Third, TAC contends that MCI's failure to disclose its anti-aggregator policy is willful

misconduct. TAC's argument consists primarily of a reiteration of other arguments made

---

[8]      Mr. Reckart's affidavit indicates the following facts: (1) Messrs. Reckart and
Spencer discussed SCA discounts with Mr. Samuel, (2) Mr. Reckart was informed by Mr.
Samuel that TAC intended to sign Ferris Baker Watts (an existing MCI customer), (3)
that Mr. Cunninghist, MCI's Regional Manager, was upset that an existing MCI customer
was switching to TAC, and (4) that subsequently, MCI denied SCA discounts to TAC.
See Reckart Affidavit at ¶¶ 4-7.

10

throughout its cross-motion for summary judgment and opposition to the plaintiff's motion for summary judgment. While TAC has produced some evidence that MCI disliked dealing with aggregators and had a general concern about aggregators, it has failed to produce any evidence that MCI employees committed intentional acts against TAC as a result of a company policy against aggregators.

Because TAC has failed to produce evidence of willful misconduct or raise a question of material fact regarding MCI's calculation of the unpaid bills, MCI is entitled to summary judgment in its favor in the amount of $81,599.61.

C.     **TAC's counterclaim for damages stemming from MCI's violation of section 201(b) of the Federal Communications Act**:

MCI moves for summary judgment, claiming that damages for its violation of section 201(b) of the Federal Communications Act should be limited to the discounts not awarded: $8,452.89. TAC, on the other hand, argues that a jury should determine the precise measure of damages because it is entitled to consequential damages and attorney's fees under 47 U.S.C. § 206.[9] TAC reasons that it is entitled to consequential damages for lost profits because if MCI had "merely complied with the Act, . . . TAC would have flourished into a successful and profitable business." TAC's Memorandum at 16. In other words, TAC claims that it went out of

---

[9]     47 U.S.C. § 206 states that "[i]n case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of the chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case."

business because MCI failed to interpret the ambiguous tariff in favor of TAC, thereby denying it $8,452.89 in discounts.

In contrast, MCI argues that TAC went out of business because its employees lacked the requisite experience and skill to manage the company. MCI states that when TAC went out of business in 1990, it had amassed a debt of well over $200,000, and its revenue was insufficient to overcome such a debt. See MCI's Memorandum at 6-7. Further, MCI notes that even if it had complied with the Act, TAC's debt would have been approximately $192,000. See MCI's Reply Memorandum at 17. TAC presents no evidence to dispute these calculations. Accordingly, common sense dictates that MCI's failure to award TAC the discounts was not the reason for TAC's downfall, as the award of discounts would have been insufficient to overcome TAC's debts. Therefore, MCI's damages for the violation of section 201(b) are limited to the discounts not awarded: $8,452.89.

D.     **Interest, costs, and attorney's fees**:

Both sides have prevailed in the sense that they are obtaining some relief, although not full relief: MCI is receiving a judgment of $81,599.61, representing unpaid bills, and TAC is receiving a judgment of $8,452.89, representing damages for MCI's violation of section 201(b) of the Federal Communications Act. It appears that both sides are entitled to prejudgment interest, but their briefs do not state (i) an interest rate or (ii) how interest is to be calculated. Both parties also request payment for costs and attorney's fees, but their briefs do not state (i) the amounts they are seeking, or (ii) how under the relevant law, costs and attorney's fees are to be calculated when both sides prevail.

12

If parties wish to press the issues of interest, costs, and/or attorney's fees, briefs stating the relevant law and facts are due on October 8, 2001. Parties are encouraged, however, to discuss the matter because both sides prevailed on at least one claim and may be content to allow the matter of attorney's fees to drop. If so, counsel should inform the Court in a letter by October 8, 2001.

## IV. Conclusion

For the reasons stated above, this Court shall, by separate Order, GRANT the plaintiff's Motion for Summary Judgment as to all issues except interest, costs, and attorney's fees and DENY the defendant's Cross-Motion for Summary Judgment.

Dated this 25TH day of September 2001.

Benson Everett Legg
United States District Judge

13